## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GEREMY STONE,

      Plaintiff,

vs.                                                                                          No. CIV 05-508 JB/RLP

CHRISTOPHER JUAREZ and
ORLANDO CAMACHO,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary Judgment Against Defendant Juarez and Memorandum in Support, filed December 15, 2005 (Doc. 18).  The Court held a hearing on this motion on January 6, 2006.  The primary issues are: (i) whether there is a genuine issue of material fact that Juarez detained and arrested Stone without a warrant and without probable cause; and (ii) whether there is a genuine issue of material fact that Juarez arrested Stone in retaliation of Stone exercising his First Amendment rights.  The Court finds that there is a genuine issue of material fact whether probable cause existed for Juarez' warrantless detention and arrest of Stone.  The Court also finds that there is no genuine issue of material fact that Juarez arrested Stone in retaliation of Stone exercising his First Amendment speech rights.  The Court will grant the motion in part and deny the motion in part.

## FACTUAL BACKGROUND

On December 26, 2004, Officer Christopher Juarez, a City of Albuquerque Police Officer, was detaining a group of young, male gang members at the Coronado Shopping Mall in Albuquerque, New Mexico.  See Criminal Complaint at 1 (filed December 26, 2004); Deposition of Christopher

Juarez (hereinafter "Juarez Depo.") at 10:2-12:24 (taken December 1, 2005).  Plaintiff Geremy Stone

yelled "[i]t's all about the Bloods," at a group of young, male gang members flying their "colors" --

hanging blue bandanas in their back pockets -- at the Coronado Shopping Mall.  Juarez Depo. at

12:19-13:3; Criminal Complaint at 1.  Stone's comment caused the gang members' tempers to flare,

and they asked Juarez "what did that guy say?" in a manner which appeared to Juarez that the gang

members could not believe that Stone had actually said what he did.  Juarez Depo. at 13:4-25;

Criminal Complaint at 1.

Juarez walked towards Stone to confirm what he had said, and to brief him on the volatility

of the situation and his words.  See Juarez Depo. at 14:14-15:3.  Juarez was planning on "cutting

[Stone] loose" after talking to him.  Id. at 15:2-3.  The Defendants admit that it was not Juarez' intent

to arrest Stone initially, but contend that Stone could have been arrested for shouting "it's all about

the Bloods."  Id. at 15:2-20.  Juarez asked Stone to repeat what he had said, far enough away from

the gang members so that the gang members could not hear what was being said.  See id. at 15:24-

16:13.

Juarez then asked Stone to stop walking and identified himself as a police officer.  See id. at

16:16-23.  Stone kept walking, so Juarez grabbed Stone's arm and told him to "turn around."  Id. at

16:17-17:7.  Stone pulled his arm away and stated: "Fuck you."  Id. at 17:3-18:13.  The mall was

"crowded with people, family, children everywhere," because it was the day after Christmas.  Id. at

18:24-19:1.  Stone did not realize that Juarez was a police officer when he stated "fuck you."

Deposition of Geremy Stone (hereinafter "Stone Depo.") at 19:4-6 (taken November 15, 2005).

Stone asserts that he would have afforded the police more respect had he known he was dealing with

law enforcement authorities.  See id. at 27:11-28:21.  Stone believed that Juarez was a security officer

when he stated "fuck you."   See id.

After Stone pulled his arm away and stated "fuck you," Juarez regained control in the "escort position," and then performed an "escort" or arm bar takedown, driving Stone to the ground.  Id. at 19:11-16.  Officer Orlando Camacho saw Juarez "scuffling" with Stone and came over to assist.  Id. at 19:17-19.  Stone, while face down on the ground, tucked his arms under his body and clenched his fists.  See id. at 19:23-24.  The officers told Stone, several times, to put his arms behind his back, and Stone refused to do so.  See id. at 19:24-20:1.  Stone at that point started laughing and stated, "[y]ou guys are pussies."  Id. at 20:2-4.  The officers then told Stone several more times to put his hands behind his back.  See id. at 20:4-6.  Camacho then maced Stone.  See id. at 20:7-9.  After the Mace took effect, the officers placed Stone in custody.  See id.

Stone yelling "fuck you" prompted his arrest under the state disorderly conduct statute.  See id. at 17:21-24; 22:13-20; 21:1-22:12.  The Defendants deny, however, that Stone was arrested for yelling "fuck you" to Juarez; rather, the Defendants contend that Stone was arrested for yelling "fuck you" in a crowded mall where families were present.  See id. at 18:12-19:8; 22:9-20.  Juarez did not intend to place Stone under arrest until Stone pulled his arm away from Juarez and stated "fuck you."  Id. at 22:9-12.  Also, Juarez did not believe that Stone had resisted arrest when Stone first pulled his arm away, but rather Juarez asserts that the resisting arrest charge was the result of Stone not giving up his hands when ordered to do so.  See id. at 18:4-6; 20:10-12.

Juarez charged Stone with Disorderly Conduct pursuant to state statute and city ordinance, and with "Resisting, Evading, Or Obstructing An Officer."  Criminal Complaint at 1-2.  Juarez contends that (i) Stone's statement of "it's all about the Bloods" constituted disorderly conduct under the City Code, Juarez Depo. at 17:8-13; (ii) Stone yelling the obscenity in a crowded mall violated

the state disorderly conduct statute, <u>see id.</u> at 18:12-19:8; 22:9-20; and (iii) Stone resisted arrest when

he would not present his hands, <u>see id.</u> at 18:4-6; 20:10-12.  Stone was cited under §§ 30-20-1A and

30-22-1 of the New Mexico Statutes and under § 12-2-5D of the Albuquerque Code.

## PROCEDURAL BACKGROUND

The Initial Pretrial Report ("IPTR") provides that the parties shall file their motion "packages"

containing "all papers related to the motion (i.e., the motion, response, and reply with any

accompanying memoranda or exhibits) . . . no later than Dec. 1, 2005."  IPTR at 11, filed June 30,

2005 (Doc. 12).  The IPTR further provides that "any pretrial motion packages filed after the above

date shall be considered untimely in the discretion of the Court."  <u>Id.</u>  The Court originally set the

motions deadline for December 1, 2005, <u>see id.</u>, but by order, extended the deadline until December

12, 2005, <u>see</u> Order Granting the Parties Stipulated Motion to Amend IPTR to Extend Deadlines at

1, filed November 9, 2005 (Doc. 15).  The Court also scheduled a motion hearing for January 6,

2006.  <u>See</u> IPTR at 11.

Juarez filed his motion for summary judgment on December 15, 2005 -- three days after the

deadline for filing motion packages.  <u>See</u> Plaintiff's Motion for Summary Judgment Against

Defendant Juarez and Memorandum in Support.  Stone moves for summary judgment on his claim

that Juarez unlawfully detained him and unlawfully arrested him.  <u>See id.</u> at 1.  Juarez objects that

Stone's motion is untimely.  <u>See</u> Response Memorandum in Opposition to Plaintiff's Motion for

Summary Judgment ("Response") ¶ 1, at 1, filed January 3, 2006 (Doc. 19).  Without waiving this

objection, however, the Defendants submit a timely response to the merits of Stone's motion.  <u>See</u>

<u>id.</u> at 2.

## STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides for entry of summary judgment where "there is no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995)(citation omitted). In applying this standard, the record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. See McKnight v. Kimberly Clark Corp., 149 F. 3d 1125, 1128 (10th Cir. 1998)(citing Applied Genetics Int'l, Inc. v. First Affiliated Sec. Inc., 912 F.2d 1238, 1241 (10th Cir. 1990)).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the movant will not bear the burden of proof at trial, this burden may be met by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 325). Once the moving party meets its burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Id.

The opposing party may not rest upon "mere allegations and denials in the pleadings . . . but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)(citation omitted). An issue of fact is genuine if the

evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  See id. at 249.  Summary judgment is appropriate against any "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322.

"The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1490 (10th Cir. 1995)(citation omitted).  The court must disregard statements of mere belief.  See Tavery v. U.S., 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citing Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 831 (1950)).  The existence of a mere scintilla of evidence is insufficient to support the nonmoving party's position. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.  "Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'" Wright-Simmons v. Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998)(quoting Thomas v. IBM, 48 F.3d at 485).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

When a government official asserts the defense of qualified immunity, the burden shifts to the

plaintiff to establish: (i) "that the defendant's actions violated a constitutional or statutory right."; and (ii) "if the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)(citations and internal quotations omitted).  "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity." Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995).

In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether "the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Id. at 1128 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)(internal quotations omitted)).  The second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001).  Thus, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  In making this determination, the Court will view the evidence in the light most favorable to the non-moving party; however, the record must demonstrate that the plaintiff has satisfied his heavy two-part burden. See Medina v. Cram, 252 F.3d at 1128.

## FOURTH AMENDMENT LAW

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free

of unreasonable seizure if the officer makes a warrantless arrest without probable cause." Olsen v.

Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(citing Tenn. v. Garner, 471 U.S. 1, 7

(1985)).  A police officer may effectuate a warrantless arrest so long as there is probable cause for

the arrest.  See Michigan v. DeFillippo, 443 U. S. 31, 36 (1979)(citations omitted).  "'[P]robable

cause' to justify an arrest means facts and circumstances within the officer's knowledge that are

sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances

shown, that the suspect has committed, is committing, or is about to commit an offense." Id. at 37

(citations omitted).

"When a warrantless arrest is the subject of a 1983 action, the defendant arresting officer is

entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest

the plaintiff." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)(citations and internal quotations

omitted).  "Even law enforcement officials who reasonably but mistakenly conclude that probable

cause is present are entitled to immunity."  Id. (citation and internal quotations omitted).

"Probable cause need only exist as to any offense that could be charged under the

circumstances." Smith v. Wampler, 108 Fed. Appx. 560, 567 (10th Cir. 2004)(citations and internal

quotations omitted).  The Tenth Circuit recently stated:

> [A] police officer's subjective reason for making the arrest need not be the criminal
> offense as to which the known facts provide probable cause.  An arrest is not invalid
> under the Fourth Amendment simply because the police officer subjectively intended
> to base the arrest on an offense for which probable cause is lacking, so long as the
> circumstances, viewed objectively, justify the arrest.  Subjective intent of the arresting
> officer, however it is determined (and of course subjective intent is always determined
> by objective means), is simply no basis for invalidating an arrest.  Those are lawfully
> arrested whom the facts known to the arresting officers give probable cause to arrest.

Apodaca v. City of Albuquerque, No. 05-2008, 2006 U.S. App. LEXIS 8811, at *7-8 (10th Cir.

April 11, 2006).

-8-

## NEW MEXICO LAW

N.M.S.A. § 30-20-1A states that "disorderly conduct consists of: engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace."  Section 12-2-5(D) of the Albuquerque City Code provides that "disorderly conduct consists of . . . : Inciting, causing, aiding or abetting or assisting in creating any riot, affray, or disturbance at or within any dwelling or building, whether public or private, or at any other public place in the city."  New Mexico courts have held that a court must first satisfy itself that a conviction under the state statute does not "offend the first and fourteenth amendments' right of free speech."  State v. James M., 111 N.M. 473, 475, 806 P.2d 1063, 1065 (Ct. App. 1990).

In New Mexico, disorderly conduct is conduct with the "tendency [] to disturb the peace."  State v. Salas, 127 N.M. 686, 690, 986 P.2d 482, 486 (Ct. App. 1999).  A breach of the peace is an act likely to cause violence or which disturbs the peace and quiet of the community by causing "consternation and alarm."  State v. Doe, 92 N.M. 100, 102, 583 P.2d 464, 466 (1978).  "There is no requirement that [others] be actually offended by the comments, or that a crowd must gather in response to a defendant's behavior.  The only requirement is that Defendant's actions 'disturb the public peace.'"  State v. Salas, 127 N.M. at 691, 986 P.2d at 487.

The New Mexico Court of Appeals in State v. James M., 111 N.M. 473, 806 P.2d 1063, summarized § 30-20-1's requirements:

> Conduct which tends to disturb the peace is that conduct which is inconsistent with the peaceable and orderly conduct of society.  The court in State v. Florstedt, 77 N.M. 47, 419 P.2d 248 (1966), equated disturb the peace with breach of the peace.  In Florstedt, the court adopted the New York court's definition of breach of the peace: It is a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community.

\* \* \* \*

Police officers, by nature of their training, are generally expected to have a higher tolerance for offensive conduct and language. <u>See</u> <u>State v. Wade</u> (screaming obscenities and yelling get the hell out of the house do not constitute fighting words, particularly when addressed to police officers who are expected to exercise restraint).

<u>Id.</u> 111 N.M. at 476-477, 806 P.2d at 1066-67 (citations and internal quotations omitted).

## **LAW REGARDING FIRST AMENDMENT AND RETALIATION**

### 1.    **Fighting Words Doctrine.**

As the United States Court of Appeals for the Tenth Circuit has recognized, "[t]he Supreme Court has addressed the subject of fighting words in several contexts." <u>Cannon v. Denver</u>, 998 F.2d 867, 872 (10th Cir. 1993).  In <u>Cannon v. Denver</u>, the Tenth Circuit summarized the United States Supreme Court's "fighting words doctrine":

In <u>Cantwell v. Connecticut</u>, 310 U.S. 296 . . . (1940), the defendant was arrested for a breach of the peace in a predominantly Roman Catholic neighborhood after he played a record on the streets which denounced organized religion, and especially Catholicism, as the instrument of Satan. No crowd was drawn, but two of the hearers testified that they were close to violence. The Court reversed Cantwell's conviction on a count for commission of the common law offense of inciting a breach of the peace, stating:

> Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace.  One may, however, be guilty of the offense if he commits acts or makes statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended.  Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer.  Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

> We find in the instant case no assault or threatening of bodily harm, no

-10-

truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion.

* * * *

310 U.S. at 309-11 (emphasis added).

Two years later in Chaplinsky v. New Hampshire, 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942), the Court upheld the conviction of a defendant who had called a police officer to his face "a God damned racketeer" and a "damned Fascist." Id. at 569. The court held this language to be "fighting words," stating there was no constitutional problem in punishing utterances, inter alia, of "the insulting or fighting words -- those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id. at 572 (emphasis added). The Court stated that "it has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Id.

We also find that Cohen v. California, 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971), is instructive. When confronted with an appeal from a conviction of a man who had entered a courthouse wearing a jacket which read "F--- the Draft," the Supreme Court reversed. It held that the words on the jacket did not constitute fighting words. Rather fighting words were "those personally abusive epithets which, when addressed to the ordinary citizen, are as, a matter of common knowledge, inherently likely to provoke violent reaction." Id. at 20 (emphasis added). The Court said that while the obscenity displayed in relation to the draft was not uncommonly "employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer.'" Id. (quoting Cantwell, 310 U.S. at 309). The Court noted that "words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." Id. at 26.

Here the defendants have argued that the signs aroused violent feelings in some persons who viewed them. The fact that speech arouses some people to anger is simply not enough to amount to fighting words in the constitutional sense. "[A] function of free speech under our system is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337

-11-

U.S. 1, 4 . . . (1949).  It is only where "the speaker passes the bounds of argument or persuasion and undertakes incitement to riot" that the police may intervene to prevent a breach of the peace.  Feiner v. New York, 340 U.S. 315, 321, 95 L. Ed. 295, 71 S. Ct. 303 (1951). The Court in Feiner upheld a conviction of a man who addressed a crowd of 75 or 80 people, both blacks and whites, who "gave the impression that he was endeavoring to arouse the Negro against the white, urging that they rise up in arms and fight for equal rights."  Id. at 317.

Cannon v. Denver, 998 F.2d at 872-73 (10th Cir. 1993).

After discussing the Supreme Court's cases on fighting words, the Tenth Circuit set out its fighting words test: "Fighting words are thus epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas."  Id. at 873.  See Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1285 (10th Cir. 2003)(reiterating the above described test as the Tenth Circuit's fighting words test).  The Tenth Circuit has noted that "[i]t has been stated that 'fighting words are not a means of exchanging views, rallying supporters or registering a protest; they are directed against individuals to provoke violence or inflict injury.'" Cannon v. Denver, 998 F.2d at 873 n.4 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 401 (1992)(White, J., concurring)).  "To be punishable, words must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'"  Johnson v. Campbell, 332 F.3d 199, 212 (3rd Cir. 2003)(quoting Texas v. Johnson, 491 U.S. 397, 409 (2003)).

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.  Speech is often provocative and challenging. . . . But it is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Houston v. Hill, 482 U.S. 451, 461 (1987)(citation omitted).  The First Amendment protects a fair amount of verbal protest directed toward a police officer.  See United States v. McKinney, 9 Fed. Appx. 887,

887-890 (10th Cir. 2001)(finding that a person who twice told an officer to "go f*** himself," engaged in protected speech); <u>Buffkins v. City of Omaha</u>, 922 F.2d 465, 472 (8th Cir. 1990)(holding that the district court should have found as a matter of law that the use of the word asshole directed at police officers does not constitute fighting words); <u>Duran v. City of Douglas</u>, 904 F.2d 1372, 1377-78 (9th Cir. 1990)(stating that arrest for obscene gesture toward officer would be a "serious First Amendment violation").

### 2.        Retaliation for Exercise of First Amendment Rights.

To prevail on a claim of retaliation in violation of the First Amendment, a plaintiff must show: "(1) he was engaged in constitutionally protected activity, (2) defendant's actions caused him to suffer an injury that likely would chill a person of ordinary firmness from continuing to engage in that activity, and (3) defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." <u>Lackey v. County of Bernalillo</u>, No. 97-2265, 1999 U.S. App. LEXIS 75, at *11 (10th Cir. January 5, 1999)(citations omitted).

"'[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" <u>Poole v. County of Otero</u>, 271 F.3d 955, 961 (10th Cir. 2001)(quoting <u>DeLoach v. Bevers</u>, 922 F.2d 618, 620 (10th Cir. 1990)).  Although the issue in <u>Poole v. County of Otero</u> did not involve retaliatory arrest for the exercise of protected speech, and the Tenth Circuit has not specifically addressed the situation currently before this Court, the Sixth Circuit has stated in a similar situation: "[T]he existence of probable cause is not determinative of the constitutional question if, as alleged here, the plaintiff was arrested in retaliation for his having engaged in constitutionally protected speech.  The law is well established that 'an act taken in retaliation for the exercise of a constitutionally protected right is

actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" Greene v. Barber, 310 F.3d 889, 894 (6th Cir. 2002)(citing Bloch v. Ribar, 156 F.3d 673, 681-82 (6th Cir. 1998) and quoting Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir. 1984), and DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990)).

## ANALYSIS

The Court will consider the motion, as it believes that it has minimized the prejudice that Juarez asserts; the Court reviewed the briefing before the hearing and has thoroughly reviewed the briefing after the hearing.  The Court finds that the evidence, viewed in the light most favorable to Juarez, is sufficient to show that probable cause existed to arrest Stone.  The Court also finds, however, that when the evidence is viewed in the light most favorable to Juarez, there is no genuine issue of material fact that Juarez unconstitutionally retaliated against Stone for the exercise of his First Amendment rights.

## I.    THE COURT WILL CONSIDER THE MOTION.

Juarez argues that Stone did not timely file his motion.  There can be little dispute that Stone's motion is not timely.  Juarez also argues, however, that, because Stone's motion is not timely, the Court should not consider the motion.

Juarez argues that, if Stone presents any package to the Court before the hearing, the Court will have little time to consider the motion's merits.  The Court had an opportunity to review the briefing before the hearing, and has again reviewed the briefing after the hearing.  The Court therefore believes that it has minimized the asserted prejudice, and will consider the motion.  Also, the motion raises legal issues that the Court will need to consider at some point.

II.     **THE FACTS, WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO JUAREZ, SHOW THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER PROBABLE CAUSE EXISTED.**

The Court cannot, at this state of the proceedings, determine whether Stone engaged in protected speech when he yelled "its all about the Bloods" to gang members flying blue colors or whether such phrase constituted fighting words.  There is also a genuine issue of material fact whether the phrase "its all about the Bloods" violated New Mexico law in this situation.

A.     **THERE ARE INSUFFICIENT FACTS BEFORE THE COURT TO DETERMINE WHETHER "ITS ALL ABOUT THE BLOODS" CONSTITUTED FIGHTING WORDS IN THIS SITUATION.**

If Juarez had probable cause to arrest Stone for any of his conduct, then Stone's Fourth Amendment claim of a warrantless arrest in the absence of probable cause must fail.  In speech cases, the first inquiry is to determine whether the speech in which the person arrested engaged is protected speech under the First Amendment.  Stone yelled to an alleged group of gang members: "Its all about the Bloods."  The Court believes that a reasonable person could find that this statement constituted fighting words and that the First Amendment does not protect such language in the context in which they were uttered.

The Court finds that there are insufficient facts before it to determine whether the statement "its all about the Bloods" is constitutionally protected speech in this situation or whether such a statement constitutes fighting words.  Fighting words are epithets "(1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas."  Burns v. Bd. of County Comm'rs, 330 F.3d at 1285.

First, there is a genuine issue of material fact whether the phrase "its all about the Bloods" was directed at a group of hearers -- gang members flying blue colors.  Stone was walking past a group

-15-

of young men all "flying" their blue colors and yelled a phrase that contained an explicitly positive connotation for a rival gang -- the Bloods -- and possibly an implicitly negative connotation for the gang members that were flying their colors. A reasonable person could infer in this situation that Stone was directing a derogatory remark to a group of gang members.

Second, there is also a genuine issue of material fact whether the phrase "its all about the Bloods" is inherently likely to cause a violent reaction in the hearer. Again, Stone yelled a phrase at a gang that contained positive connotations for its rival gang, and negative connotations for the group of gang members which heard the phrase. The Court cannot determine from the record before it whether such a phrase shouted to a group of gang members, flying their blue colors, is inherently likely to cause a violent reaction. Gang members often carry weapons and engage in violence both in general and with rival gangs. A reasonable person could infer that such a statement made to a group of gang members openly displaying their blue colors and gang affiliation could inherently cause immediate violence. The Court does not have enough information on the record, concerning how rival gangs interact with each other, to determine whether this phrase is likely to erupt in violence or fisticuffs. Third, there is a genuine issue whether such a phrase plays a role in the expression of ideas. In some situations and circumstances, such a phrase could play a role in the expression of ideas. In this situation, however, there is a question whether such a statement plays a role in the expression of ideas. The statement was made in a crowded mall where children were present and where a rival gang was flying its colors. The danger of immediate violence in the form of fighting or even gun fire, and the resulting risk to both adults and children, may outweigh any expression of ideas conveyed in such a phrase.

Because a reasonable person could find that the phrase "its all about the Bloods" constituted

fighting words in this situation, the Court cannot say on the record before it, whether it is protected speech.  The Court also finds that, even if this phrase in this situation were protected speech, such a right to engage in that speech has not been clearly established.  The Court has found no case law discussing verbal challenges or implicit insults being yelled at a group of rival gang members.  Thus, even if Stone engaged in protected conduct, Juarez did not violate Stone's clearly established constitutional rights, and Juarez is thus entitled to qualified immunity on Stone's warrantless arrest in the absence of probable cause claim when the evidence is viewed in the light most favorable to Juarez.

**B.     THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER JUAREZ HAD PROBABLE CAUSE TO ARREST STONE.**

For an arrest to be found lawful, probable cause needs only to exist as to any charge that could have been brought under the circumstances.  See Smith v. Wampler, 108 Fed. Appx. at 567.  Thus, if Juarez had probable cause to believe that Stone violated either Section 12-2-5(D) of the Albuquerque City Code, or N.M.S.A. § 30-20-1A, then Juarez' arrest of Stone does not violate the Fourth Amendment.

There is a genuine issue of material fact whether Juarez had probable cause to believe that Stone had violated Section 12-2-5(D) of the Albuquerque City Code, which provides that "disorderly conduct consists of . . . : Inciting, causing, aiding or abetting or assisting in creating any  . . . disturbance.  A reasonable person could find that the phrase "its all about the Bloods," yelled at a group of gang members, resulted in a disturbance.  The gang members became agitated and were incredulous that Stone would have said "its all about the Bloods" to them.  Juarez was not required to wait for the gang members to erupt into violence or a riot before arresting Stone.  All that is required under the code is a disturbance.  The Court believes that the reaction of the gang members

-17-

to the volatile comment could constitute a disturbance.  There is at least a genuine issue whether the gang members reactions in a crowded mall the day after Christmas constituted a disturbance.

Also, Stone's volatile comments directed towards the gang members could be a violation of N.M.S.A. § 30-20-1A, which provides that "disorderly conduct consists of: engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace."  Here, there is a genuine issue of material fact whether Stone's conduct of directing "its all about the Bloods" towards a group of gang members, flying blue colors, constituted conduct which tends to disturb the peace in violation of N.M.S.A. § 30-20-1A.

A breach of the peace is an act likely to cause violence or disturbs the peace and quiet of the community by causing "consternation and alarm."  <u>State v. Doe</u>, 92 N.M. 100, 102, 583 P.2d 464, 466 (1978).  As explained above, there is a genuine issue whether the phrase "its all about the Bloods" is an act likely to cause violence.  "There is no requirement that [others] be actually offended by the comments, or that a crowd must gather in response to a defendant's behavior.  The only requirement is that Defendant's actions 'disturb the public peace.'"  <u>State v. Salas</u>, 127 N.M. at 691, 986 P.2d at 487.  A reasonable person could find in these circumstances that the act of yelling "its all about the Bloods" to a group of rival gang members is an act likely to cause violence, and thus a violation of New Mexico law.

A reasonable person could find that Juarez had probable cause to believe that Stone had violated either Section 12-2-5(D) of the Albuquerque City Code, or N.M.S.A. § 30-20-1A, by yelling "its all about the Bloods" at members of a gang flying blue colors.  Because the Court finds that a reasonable person could find that Juarez had probable cause to believe that Stone had violated either Section 12-2-5(D) of the Albuquerque City Code, or N.M.S.A. § 30-20-1A by yelling "its all about

the Bloods," the Court need not discuss whether Juarez had probable cause to believe that Stone

committed any crimes by saying "fuck you" when Juarez grabbed his arm.  See Smith v. Wampler,

108 Fed. Appx. at 567.

### III. THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT JUAREZ ARRESTED STONE FOR SAYING "FUCK YOU," AND THAT SUCH RETALIATORY ARREST VIOLATED STONE'S CONSTITUTIONAL RIGHTS.

The Court finds that Stone engaged in protected conduct when he said "fuck you" to Juarez

in a crowded mall, and that Juarez' arrest for such conduct violated Stone's clearly established

constitutional rights under the First Amendment.  The Court also finds that Juarez arrested Stone in

retaliation of Stone engaging in constitutionally protected speech.

### A. "FUCK YOU" IS PROTECTED SPEECH WHEN HEARD BY A POLICE OFFICER IN FRONT OF A CROWD OF PEOPLE.

"Fuck you" in this situation is protected speech directed at a police officer regardless whether

a crowd of people heard it.  "[T]he First Amendment protects a significant amount of verbal criticism

and challenge directed at police officers."  Houston v. Hill, 482 U.S. at 461.  The Tenth Circuit

recently found that a person who told an officer to "go f*** himself" had engaged in protected

speech.  United States v. McKinney, 9 Fed. Appx. at 887-890.  The court stated that "[the plaintiff's]

remarks were the R-rated equivalent of other commonly used phrases, such as 'buzz off,' 'go away,'

'leave me alone,' and 'get lost.'"  Id. at 889.  The court went on to note that, "[t]hough her lack of

civility may be disheartening, [the plaintiff] has a constitutional right to voice her objections to the

officer's inquiries."  Id. (citations omitted).  Stone's use of the phrase "fuck you," directed at Juarez,

is not constitutionally distinguishable from the phrase "go f*** [yourself]," directed at the officer in

United States v. McKinney.  Indeed, many people might be more offended by the latter phrase than

the former.

-19-

Juarez argued at the hearing that this speech is not protected, because Stone did not realize that Juarez was a police officer and because Juarez did not arrest Stone for saying "fuck you" to Juarez, but rather he arrested Stone for yelling "fuck you" in a crowded mall with people all around. See Transcript of Hearing at 16:9-17:5 (taken January 6, 2006). The phrase "fuck you" by itself does not rise to fighting words when directed at a police officer, even in a crowded mall. The Tenth Circuit in McKinney did not rely only on the fact that the speech "go f*** [yourself]" was directed at an officer. The court stated: "Though tasteless and undoubtedly offensive to many, Ms. McKinney's language would not provoke the average person to retaliate under the circumstances." The Court believes that, under the circumstances of the case, the phrase "fuck you" would not provoke the average person -- whether police officer or citizen -- to retaliate. Much like in McKinney, Stone did not indicate that he wanted to fight the officer, and he was pulling away from the officer much like the defendant in McKinney left the officer's presence after telling him to "go f*** himself." The phrase "fuck you" alone is not enough to likely result in violence and is not "inherently likely to cause a violent reaction." Burns v. Bd. of County Comm'rs, 330 F.3d at 1285. In addition, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" United States v. Poocha, 259 F.3d 1077, 1081 (9th Cir. 2001)(quoting Houston v. Hill, 482 U.S. at 462). A police officer is expected to exercise a higher degree of restraint than an average citizen whether the speaker is aware that the speech is directed to a police officer or not.

Juarez' asserted reason for arresting Stone is also impermissible; that a crowd was present, including children, when Stone yelled "fuck you" does not make this speech unprotected. The use of the word "fuck" displayed to the public is protected speech. Cohen v. California, 403 U.S. at 26.

In Cohen, the Supreme Court found that the phrase "fuck the draft" was protected speech.  Id. at 26.

Cohen was at a courthouse wearing a jacket with the phrase "fuck the draft" written on it.  Id. at 16.

The Supreme Court stated: "This is not, for example, an obscenity case."  Id. at 20.  The Court also

found that the phrase did not constitute fighting words.  See id.  The Supreme Court went on to note

that "the mere presumed presence of unwitting listeners or viewers does not serve automatically to

justify curtailing all speech capable of giving offense," and recognized that it has "consistently

stressed that we are often 'captives' outside the sanctuary of the home and subject to objectionable

speech."  Id. at 21 (citation omitted).  The Court stated: "[W]e do not think the fact that some

unwilling 'listeners' in a public building may have been briefly exposed to it can serve to justify this

breach of the peace conviction where, as here, there was no evidence that persons powerless to avoid

appellant's conduct did in fact object to it . . . ."  Id. at 22.  Finally the Court concluded: "It is, in

sum, our judgment that, absent a more particularized and compelling reason for its actions, the State

may not, consistently with the First and Fourteenth Amendments, make the simple public display here

involved of this single four-letter expletive a criminal offense."  Id. at 26.

As shown by the above case law, Stone's utterance of the phrase "fuck you," spoken to an

officer in front of a crowd, is Stone's First Amendment right.  The Court also finds that the right to

say "fuck you" in this situation is clearly established: "Ordinarily, in order for the law to be clearly

established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly

established weight of authority from other courts must have found the law to be as the plaintiff

maintains."  Medina v. City and County of Denver, 960 F.2d at 1498.  Cohen v. California, 403 U.S.

15, and United States v. McKinney, 9 Fed. Appx. 887 are cases sufficiently on point and thus this

right is clearly established.

## B.    THE FIRST AMENDMENT RETALIATION TEST IS MET HERE.

To prevail on his claim of retaliation in violation of the First Amendment, Stone must show: (i) he was engaged in constitutionally protected activity; (ii) Juarez' actions caused him to suffer an injury that likely would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) Juarez' adverse action was substantially motivated as a response to Stone's exercise of constitutionally protected conduct. See Lackey v. County of Bernalillo, 1999 U.S. App. LEXIS 75, at *11.  In addition, "an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" Poole v. County of Otero, 271 F.3d at 961. See Greene v. Barber, 310 F.3d at 894 (stating the same in the protected speech context.)

First, as noted above, Stone engaged in a constitutionally protected activity when he said "fuck you" to Juarez in a crowded mall.  Second, Juarez' actions caused Stone to suffer an injury that likely would chill a person of ordinary firmness from continuing to engage in that activity.  Stone suffered the injury of arrest for stating "fuck you," which would chill the ordinary person from continuing to engage in such activity.  The Court finds that a person of ordinary firmness would not continue the use of the phrase "fuck you" under the threat of arrest.

Finally, Juarez' adverse action was substantially motivated as a response to Stone's use of the phrase "fuck you."  Juarez admitted that he arrested Stone for engaging in constitutionally protected activity.  Juarez conceded that he was planning on "cutting [Stone] loose" after talking to him about yelling the phrase "its all about the Bloods."  Id. at 15:2-3.

Juarez also concedes that Stone yelling "fuck you" prompted Juarez to arrest Stone under the state disorderly conduct statute.  Id. at 17:21-24; 22:13-20.  Finally, Juarez did not intend to place

Stone under arrest until Stone pulled his arm away from Juarez and stated "fuck you." Id. at 22:9-11.

There is no issue for the jury to decide. Stone engaged in protected speech, Juarez injured Stone through arrest, and Juarez admits that Stone's use of the phrase "fuck you" prompted his arrest. Juarez violated Stones clearly established right to engage in protected speech -- use of the phrase "fuck you" -- and Juarez is thus not entitled to qualified immunity.

**IT IS ORDERED** that the Plaintiff's Motion for Summary Judgment is granted in part and denied in part. The Court will enter judgment in the Plaintiff's favor and against Defendant Christopher Juarez on the Plaintiff's claims of illegal detention and arrest in retaliation for the Plaintiff's exercise of his First Amendment rights. The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Oliver
Kennedy & Oliver, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Peter H. Pierotti
  Assistant City Attorney
Albuquerque City Attorney's Office
Albuquerque, New Mexico

    *Attorney for the Defendants Orlando Camacho and Christopher Juarez*

-23-